STATE of Tennessee, Appellee,

v.

Tyrone G. MEADE, Appellant.

Court of Criminal Appeals of Tennessee,
at Jackson.

Oct. 22, 1996.

No Permission to Appeal Applied
for to the Supreme Court.

Randall B. Tolley, W. Otis Higgs, Memphis, for appellant.

Charles W. Burson, Attorney General & Reporter, Ellen H. Pollack, Asst. Attorney General, Nashville, John W. Pierotti, District Attorney General, P. Thomas Hoover, and Judson W. Phillips, Asst. District Attorneys General, Memphis, for appellee.

## OPINION

PEAY, Judge.

The defendant was indicted for the second-degree murders of Charles Matthews and Lavester Jefferson. The defendant was found guilty of both murders after a jury trial. Following a sentencing hearing, he was sentenced to twenty-five years for each offense, with fifteen years of the sentences to run consecutively and ten years to run concurrently, for an effective sentence of forty years.

The defendant now appeals as of right raising the following five issues:

1. The evidence was insufficient to support his convictions;

2. The trial court should have granted his motion for new trial on the basis that one of the jurors discussed the case with a third party and otherwise failed to follow the court's instructions;

3. The trial court should have granted his motion for new trial on the basis that one of the witnesses gave incomplete testimony at trial due to illness;

4. He received ineffective assistance of counsel at trial; and

5. His sentences are excessive.

After a review of the record, we affirm the defendant's convictions and remand this matter for resentencing.

On January 15, 1992, the defendant shot and killed Charles Matthews and Lavester Jefferson in Memphis, Tennessee. On January 20, 1992, the defendant turned himself in to the police and gave two statements, both of which were admitted into evidence. In his first statement, the defendant claimed that Jefferson had shot Matthews, but admitted that he had shot and killed Jefferson. In his second statement, he admitted to having shot and killed both men.

According to the defendant's second statement, Matthews and Jefferson had come to his house on the night of the murders demanding money. Jefferson had been working for the defendant in his vehicle repair shop. The defendant stated that they were "crazy," "high," and that he thought they had been drinking and "smoking dope." He claimed that both men were insulting him and his girlfriend, Wanda Catt, and that he felt threatened "by the way they were talking and the tone of their voices demanding money." He stated that he told them to leave, but they wouldn't, so he shot Matthews. Jefferson then loaded the body into the defendant's El Camino and they drove into Mississippi and dumped the body.

Wanda Catt testified that she had been parked in her car a short distance from the defendant's house when Matthews was shot. When she looked over to where Jefferson, Matthews, and the defendant had been standing, she saw one man "lying on the ground, [the defendant] was standing about at his head, standing straight up, and the third man was just casually walking towards Third Street." At that point, she testified, the defendant "extended his right hand and fired into the ground." She then left the scene in her car.

The pathologist who performed the autopsy on Matthews testified that Matthews had been shot five or six times and that he had died as a result of multiple gunshot wounds. He further testified that Matthews had been alive at the time each wound was inflicted and that the gunshot wound to the back of Matthew's head was consistent with what is known as an "execution shot." He also testified that Matthews had tested positive for both cocaine and alcohol.

Following the defendant and Jefferson's return to the defendant's house after disposing of Matthews' body, the defendant was in his bedroom and Jefferson was in the living room with the defendant's friend Roy Adams. The defendant kept two shotguns under the couch in the living room. Adams testified that Jefferson had gotten one of the shotguns out from under the couch, and was threatening to kill "some M.F." Adams got the shotgun away from Jefferson but Jefferson then got the other shotgun and "went back to the back bedroom [where the defendant was] with the gun in his hand." At that point, Adams testified, he had heard shots from some gun other than the shotgun and left the house.

According to the defendant's first statement,

[Jefferson] and Roy were in the living room and Roy was telling [Jefferson] 'please don't do that, stop.' The next thing I know is I looked up and Roy's back was facing me and [Jefferson] was facing him and the shotgun was between them. Roy was telling [Jefferson] not to do it[,] 'put the gun down.' I asked [Jefferson] to let me get out and he wouldn't and I picked the gun up and said 'let me out, let me out,' and he wouldn't let me out and I started shooting. When he fell, Roy ran out of the house and I ran out of the house.

The next night the defendant and Adams took Jefferson's body and dumped it at a location in Shelby County, Tennessee. The bodies were later discovered and the appropriate police departments contacted. After the defendant had turned himself in, he took the police to the .38 pistol with which he had shot Matthews and also took them to the heavily wooded location where he had thrown the 9mm pistol with which he had shot Jefferson. This pistol, however, was not found.

The pathologist who performed the autopsy on Jefferson testified that he had been

shot multiple times and that he had died as a result of multiple gunshot wounds. He testified that some of the wounds had been caused by shots to the front of Jefferson's body, while others had been caused by shots to the back of his body, including one of the wounds to Jefferson's head. Some of the gunshot wounds were inflicted from a distance of six inches or less, including the wound entering Jefferson's head from the back. He testified that Jefferson had been alive at the time each of the gunshot wounds was inflicted, but that he could not determine the sequence in which the shots hit Jefferson's body. He also testified that Jefferson had tested positive for cocaine, and that his blood alcohol level was forty-one hundreths of one percent, by weight of alcohol. According to the pathologist, this level of alcohol could be described as "severely intoxicated" and was high enough to produce apathy,[1] coma and even death. He also testified, however, that "experienced drinkers" might be able to function while experiencing this level of intoxication.

The defendant put on no proof after the State rested.

■ When an accused challenges the sufficiency of the convicting evidence, we must review the evidence in the light most favorable to the prosecution in determining whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). We do not reweigh or re-evaluate the evidence and are required to afford the State the strongest legitimate view of the proof contained in the record as well as all reasonable and legitimate inferences which may be drawn therefrom. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978).

■ Questions concerning the credibility of witnesses, the weight and value to be given to the evidence, as well as factual issues raised by the evidence are resolved by the trier of fact, not this Court. *Cabbage,* 571 S.W.2d 832, 835. A guilty verdict rendered by the jury and approved by the trial judge accredits the testimony of the witnesses for the State, and a presumption of guilt replaces the presumption of innocence. *State v. Grace,* 493 S.W.2d 474, 476 (Tenn. 1973).

Second-degree murder is defined as "A knowing killing of another." T.C.A. § 39–13–210(a)(1) (1991 Repl.). "Knowing" is defined as follows: "a person ... acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result[.]" T.C.A. § 39–11–106(a)(20) (1991 Repl.). The killing must also be unlawful. T.C.A. § 39–13–201 (1991 Repl.). The proof in this case is more than adequate to support a finding that the defendant knowingly and unlawfully killed Matthews and Jefferson.

■ The defendant contends on this appeal that "[t]hese cases are either ones of self-defense or voluntary manslaughter."[2] While the jury was charged with the law on both self-defense and voluntary manslaughter, it obviously rejected both theories. This was the jury's prerogative. With respect to Matthews, the proof established that the defendant shot the victim five or six times, at least once while the victim was lying on the ground. One of these shots was fired to the back of Matthews' head in an execution style. After he shot Matthews, the defendant drove to Mississippi in order to dispose of the body.[3] The only evidence of self-defense

---

1. The pathologist described "apathy" in this context as "general disregard for the environment around one's self. ... It's very much like an attitude of I don't care, and the world will go on around you, and you can focus on yourself. So, it's again a reflection of an impairment of alertness or awareness."

2. Voluntary manslaughter "is the intentional or knowing killing of another in a state of passion

produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39–13–211 (1991 Repl.).

3. The jury was properly instructed that "Inference of guilt of murder may be drawn from concealment or destruction of [the] body of deceased and, while that inference is by no means strong enough of itself to warrant conviction, it may become one of a series of circumstances

and/or adequate provocation was the defendant's own statement to the police that he had felt threatened by Matthews and Jefferson, "by the way they were talking and the tone of their voices demanding money." The evidence was sufficient for the jury to decide that the defendant had shot and killed Matthews knowingly and unlawfully, thereby properly convicting him of second-degree murder.

■ With respect to Jefferson, the evidence was uncontroverted that Jefferson had approached the defendant while holding a shotgun, and that he had stated he was going to kill "some M.F." However, this evidence did not require the jury to find that the defendant had killed Jefferson in self-defense. Three prerequisites must be met before one is justified in killing another human being under the rubric of "self-defense:" "[1] the defendant must reasonably believe he is threatened with imminent loss of life or serious bodily injury; [2] the danger creating the belief must be real or honestly believed to be real at the time of the action; and [3] the belief must be founded on reasonable grounds." T.C.A. § 39–11–611 Sentencing Commission Comments (1991 Repl.). Given Jefferson's blood alcohol content, the number of times he was shot, the fact that some of the shots entered the back of Jefferson's body, the method by which the defendant disposed of Jefferson's body and the gun with which he shot Jefferson, the jury could, and did, properly find that the defendant had not acted in self-defense. Similarly, the jury had sufficient evidence on which to reject the notion that the defendant had killed Jefferson under the circumstances required for voluntary manslaughter. This issue is without merit.

■ In his next issue, the defendant contends that the trial court should have granted his motion for new trial on one or both of two grounds: juror misconduct and/or "newly discovered evidence." The gist of the defendant's allegation of juror misconduct is that juror Charles Ward discussed the case with his sister-in-law, Cassandra Conner, prior to its conclusion and intimated that he

thought the defendant was guilty even before the State had rested its case. At the hearing on the motion for new trial, however, Mr. Ward repeatedly denied that he had discussed the case with Ms. Conner before it was over. Ms. Conner testified that she had discussed the case with Mr. Ward on the evening of the second day of the four day trial; however, she admitted on cross-examination that she had no personal knowledge of when the trial had actually occurred. Ms. Conner further testified that she had not said anything to influence Mr. Ward about the case. She did not testify that Mr. Ward had told her that he had already made up his mind about the defendant's guilt or innocence. Dora Conner, Ms. Conner's sister-in-law, testified that she and Ms. Conner had discussed Ms. Conner's conversation with Mr. Ward on the second day of the four day trial. However, she admitted on cross-examination that she was a "real good friend" of the defendant's.

■ The jury in this case was not sequestered. "When the jury is not sequestered, the defendant has the burden of showing something more than mere interactions between the jury and third persons. The defendant must instead establish 'that as the result of a juror's contact with a third person some *extraneous prejudicial information, fact or opinion* was imported to one or more jurors or some *outside improper influence* was brought to bear on one or more jurors.'" *State v. Clinton,* 754 S.W.2d 100, 103 (Tenn. Crim.App.1988) (citations omitted; emphasis in *Clinton* ). Here, the defendant failed to meet this burden of proof. This issue is without merit.

■ With respect to the defendant's claim that the court below erred in denying his motion for new trial on the grounds of newly discovered evidence, we first note that our standard of review is abuse of discretion. *Hawkins v. State,* 220 Tenn. 383, 417 S.W.2d 774, 778 (1967). In seeking a new trial based on newly discovered evidence, the defendant must establish (1) reasonable diligence in attempting to discover the evidence; (2) the materiality of the evidence; and (3) that the

from which guilt may logically be inferred." *See*

*State v. West,* 844 S.W.2d 144, 151 (Tenn.1992).

evidence would likely change the result of the trial. *See State v. Nichols*, 877 S.W.2d 722, 737 (Tenn.1994) (citing *State v. Goswick*, 656 S.W.2d 355, 358–360 (Tenn.1983)). In order to show reasonable diligence, the defendant must demonstrate that neither he nor his counsel had knowledge of the alleged newly discovered evidence prior to trial. *See Jones v. State*, 2 Tenn.Crim.App. 160, 452 S.W.2d 365, 367 (1970).

■ Here, the "newly discovered evidence" was additional testimony from Roy Adams, who had also testified at the trial of this matter. Adams testified at the new trial hearing that he had been ill with the flu and taking prescribed medication for it on the day of the trial. However, Adams's testimony at the new trial hearing added nothing of substance to what he had testified to at trial. The defendant makes much of Adams' "new" testimony that he thought the defendant had shot Jefferson in self-defense. However, the issue of whether the defendant shot and killed Jefferson in self-defense was for the jury, not for Adams. The jury certainly had before it Adams' testimony that Jefferson was holding a shotgun at the time he approached the defendant. The court below did not abuse its discretion in denying the motion for new trial on this ground. This issue is without merit.

■ The defendant next contends that he received ineffective assistance of counsel at trial. He did not raise this issue in his motion for new trial and it is therefore waived. T.R.A.P. 3(e).

■ Finally, the defendant complains that his sentences are excessive. When a defendant complains of his or her sentence, we must conduct a *de novo* review with a presumption of correctness. T.C.A. § 40–35–401(d). The burden of showing that the sentence is improper is upon the appealing party. T.C.A. § 40–35–401(d) Sentencing Commission Comments. This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn.1991).

■ A portion of the Sentencing Reform Act of 1989, codified at T.C.A. § 40–35–210, established a number of specific procedures to be followed in sentencing. This section mandates the court's consideration of the following:

(1) The evidence, if any, received at the trial and the sentencing hearing; (2) [t]he presentence report; (3) [t]he principles of sentencing and arguments as to sentencing alternatives; (4) [t]he nature and characteristics of the criminal conduct involved; (5) [e]vidence and information offered by the parties on the enhancement and mitigating factors in §§ 40–35–113 and 40–35–114; and (6) [a]ny statement the defendant wishes to make in his own behalf about sentencing.

T.C.A. § 40–35–210.

In addition, at the time of the defendant's sentencing hearing this section provided that the minimum sentence within the range was the presumptive sentence. If there were enhancing and mitigating factors, the court must start at the minimum sentence in the range and enhance the sentence as appropriate for the enhancement factors and then reduce the sentence within the range as appropriate for the mitigating factors. If there were no mitigating factors, the court may set the sentence above the minimum in that range but still within the range. The weight to be given each factor is left to the discretion of the trial judge. *State v. Shelton*, 854 S.W.2d 116, 123 (Tenn.Crim.App.1992).

The Act further provides that "[w]henever the court imposes a sentence, it *shall place on the record* either orally or in writing, what enhancement or mitigating factors it found, if any, as well as findings of fact as required by § 40–35–209." T.C.A. § 40–35–210(f) (emphasis added). Because of the importance of enhancing and mitigating factors under the sentencing guidelines, even the absence of these factors must be recorded if none are found. T.C.A. § 40–35–210 comment. These findings by the trial judge must be recorded in order to allow an adequate review on appeal.

■ Although the trial court in this case held a sentencing hearing and was provided a presentence report as well as other relevant

pleadings and evidence, it made no findings of fact, no findings as to mitigating and/or enhancing factors, and no statement of how it was applying the sentencing principles to the facts of this case. Additionally, the court ordered a portion of the defendant's sentences to run consecutively and the remainder to run concurrently. This is improper. T.C.A. § 40–35–115(a) (1990 Repl.) ("If a defendant is convicted of more than one (1) criminal offense, the court shall order sentences to run consecutively *or* concurrently") (emphasis added). Accordingly, we remand this matter for resentencing in accordance with the statutory requirements.

For the reasons set forth above, the defendant's convictions are affirmed and this matter is remanded for resentencing.

WELLES, J., and CORNELIA A. CLARK, Special Judge, concur.