IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs July 27, 2004

## STATE OF TENNESSEE v. TERRELL THOMAS

**Direct Appeal from the Criminal Court for Cocke County**
**Nos. 8975, 8976     Ben W. Hooper, II, Judge**

_____

**No. E2003-02658-CCA-R3-CD - Filed November 10, 2004**
_____

This is a direct appeal as of right from two jury verdict drug convictions of the sale of less than 0.5 grams of cocaine. The trial court sentenced the Defendant, Terrell Thomas, to concurrent terms of six years for each offense. On appeal, the Defendant argues two issues: (1) the State failed to provide exculpatory information to the defense in violation of Brady v. Maryland, 373 U.S. 65 (1963); and, (2) the trial court erred in not granting the Defendant's motion for new trial based on newly discovered evidence. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which JERRY L. SMITH and JAMES CURWOOD WITT, JR., JJ., joined.

Edward C. Miller, Public Defender, Dandridge, Tennessee, for the appellant, Terrell Thomas.

Paul G. Summers, Attorney General and Reporter; Michelle Chapman McIntire, Assistant Attorney General; Al C. Shmutzer, Jr., District Attorney General; and James B. Dunn, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

FACTS

In February of 2002, Detective Maurice Shults of the Newport City Police Department Drug Task Force conducted an undercover drug operation that ultimately led to the Defendant's arrest and convictions for the sale of cocaine. For several years Detective Shults had been using wired informants, often former drug users familiar with the drug culture, to make drug purchases in Newport and Cocke County.

On February 7, 2002, Detective Shultz used a confidential informant named Jerry Thomas to purchase drugs at a downtown Newport establishment known as Freddy's Lounge. Mr. Thomas, equipped with a wire transmitter, entered Freddy's wherein he purchased five "rocks," or 0.2 grams of crack cocaine from the Defendant. Detective Shultz monitored and taped the audio transmission of this transaction. Mr. Thomas was not paid for his services as an informant.

On February 26, 2002, Detective Shults coordinated a similar drug purchase at Freddy's Lounge using a different informant, Mr. Patrick Carr. Prior to the transaction, Detective Shults searched Mr. Carr, gave him $100 purchase money, and fitted him with a wire transmitter. Mr. Carr entered Freddy's and purchased three rocks, or 0.1 grams of crack cocaine from the Defendant. Detective Shults monitored and taped the audio transmission of this transaction. After the transaction, Mr. Carr met Detective Shultz at a predetermined location and returned the remaining purchase money, the drugs, and the transmitter. Mr. Carr was paid $100 for his services as a confidential informant that evening.

A Cocke County Grand Jury indicted the Defendant on two counts of selling less than 0.5 grams of cocaine and two counts of delivering less than 0.5 grams of cocaine. At trial the State's primary witnesses to the February 26th, 2002, drug sale were Detective Shults and the confidential informant, Mr. Carr. The tape of the drug transaction was played for the jury and both Detective Shults and Mr. Carr identified the voices as those of the Defendant and Mr. Carr. Detective Shults testified that Mr. Carr was a reliable informant whom he had utilized on multiple occasions for similar operations. The Detective further testified that Mr. Carr's qualifications to be a confidential informant in undercover drug operations were his knowledge of the streets, the "lingo," and the prices, shapes and quantities of the types of drugs the Task Force was targeting.

The defense established at trial that Detective Shults knew Mr. Carr was a former drug user and that he did not administer a drug test to Mr. Carr the evening of the operation. Detective Shults testified that he was aware Mr. Carr had "misdemeanor problems," specifically a recent shoplifting charge, and "child support" problems. At trial, Mr. Carr acknowledged his recent conviction for shoplifting, that he had used cocaine in the past, and that he was supposed to be paying child support but was approximately six months behind. The Defendant waived his right to testify and the defense offered no proof.

Following his convictions, the Defendant filed a motion for new trial and an amended motion for new trial based on newly found evidence alleging, inter alia, a violation pursuant to Brady v. Maryland, 373 U.S. 65 (1963), because the State failed to disclose that the relationship between Mr. Carr and the Drug Task Force was "directly related" to Mr. Carr's child support arrearages. At the first hearing on the motion for new trial the Defendant claimed that the State withheld exculpatory information, specifically that Mr. Carr received "leniency" for his cooperation with the Drug Task Force. The trial judge overruled the other issues alleged in the Defendant's motion but left the Brady issue open for the production of further evidence.

At a second hearing on the motion for new trial, Mr. Carr testified that Detective Shults often sent payments for his services directly to the court administering his child support payments. He also testified that Detective Shults promised to keep him out of jail if he continued to assist in undercover drug operations. Detective Shults testified that when a capias was issued for Mr. Carr's failure to pay child support, he asked the child support referee to temporarily suspend the capias until the Drug Task Force was finished using Mr. Carr's services. The referee agreed to this proposal. At the conclusion of this hearing the trial judge overruled the Defendant's motion for new trial. The Defendant filed a motion to reconsider, alleging the trial judge applied the wrong standard when denying relief based on a Brady violation. A hearing on the motion to reconsider was conducted on September 30, 2003, at the conclusion of which the trial judge again denied the Defendant relief based on Brady. This appeal followed.

ANALYSIS

**I. Procedural Issues**

At the outset we note that the Defendant, through counsel, has failed to properly adhere to the rules of appellate procedure on more than one occasion in this appeal. First, the Defendant filed his Notice of Appeal late. In order to be timely filed, a Notice of Appeal must be filed within 30 days of the entry of the trial court judgment. See Tenn. R. App. P. 4(a).[1] However, "[n]otwithstanding any other provision of law or rule of court to the contrary, in all criminal cases the 'notice of appeal' document is not jurisdictional and the filing of such document may be waived in the interests of justice." Tenn. Code Ann. § 27-1-123; see also Tenn. R. App. P. 4. In the interest of justice, we will consider Defendant's appeal.

Second, this Court will only review evidence properly included in the appellate record. Apparently, defense counsel intended to file fact-specific Brady[2] and Giglio[3] motions in the case at hand but inadvertently filed them in a different case. The Defendant, through counsel, filed a motion with this Court to supplement the record on appeal to include these late-filed motions. This Court, in an order dated April 21, 2004, denied this motion, stating: "[T]he motion is not well taken. Pleadings filed in another case of the defendant are not a part of the record of the proceedings below in the cases pending on appeal and may not be added to the record. See Rule 24(a), (g), T.R.A.P. Accordingly, it is ORDERED that the motion to supplement the record is DENIED." Despite the clarity of our order, the Defendant has submitted a brief which makes multiple substantive arguments based directly on the two motions not in the record and has attached to his appellate brief two motions which are purportedly the same motions he intended to include in the record but inadvertently filed in the wrong case.

---

[1] "In an appeal as of right to the. . . Court of Criminal Appeals, the notice of appeal required by Rule 3 shall be filed with and received by the clerk of the trial court within 30 days after the date of entry of the judgment appealed from." Tenn. R. App. P. 4(a).

[2] Brady v. Maryland, 373 U.S. 83 (1963).

[3] United States v. Giglio, 405 U.S. 150 (1972).

Documents attached to appellate briefs but not included in the record on appeal cannot be considered as part of the record on appeal. See Jamie Lee Pittman v. State, No. E2001-00546-CCA-R3-PC, 2002 WL 407226, at *1 (Tenn. Crim. App., Knoxville, March 15, 2002) (citing State v. Roberts, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988) ("When an accused seeks appellate review of an issue in this court, it is the duty of the accused to prepare a record which conveys a fair, accurate, and complete account of what transpired with respect to the issues which form the basis of the appeal.")); see also Tenn. R. App. P. 28(a); State v. Matthews, 805 S.W.2d 776, 783 (Tenn. Crim. App. 1990) (transcripts attached to appellant's brief were not considered by the court because they were not made part of the record).

Additionally, evidence recounted in the text of the appellant's brief that is not properly included in the record on appeal also will not be considered by this Court. See State v. Seyler, No. 01C01-9801-CR-00050, 1999 WL 357348, at *3 n.3 (Tenn. Crim. App., Nashville, June 4, 1999) ("Facts recited in a party's brief, but not included in the record on appeal, are not evidence."); see also Tenn. R. App. P. 24(b). Accordingly, the fact-specific Brady and Giglio motions appended to the Defendant's brief as well as those portions of his appellate brief argument referring to these motions have not been considered by this Court in the adjudication of this appeal.

## II. Issues on Appeal

In his appellate brief the Defendant lists two separate issues.[4] The Defendant alleges that: (1) he was "prejudiced by the State's failure to disclose certain exculpatory information"; and (2) that the trial court erred in not granting a new trial based on newly discovered evidence. We recognize that the exculpatory Brady information the Defendant alleges the State withheld is in fact the same information the Defendant also terms "newly discovered evidence" for purposes of his motion for a new trial. Nevertheless, because the constitutional claim of a Brady violation is indeed a separate and distinct issue from a review of an order denying a new trial based on "newly discovered evidence," we will address each claim separately.

### A. Brady Violation

The Defendant claims that the State withheld exculpatory impeachment information from the Defendant that was not discovered until after the trial and resulted in a violation of the Defendant's due process rights pursuant to Brady v. Maryland, 373 U.S. 83 (1963), and United States v. Giglio, 405 U.S. 150 (1972). We disagree.

The United States Supreme Court declared in Brady v. Maryland, 373 U.S. at 87, that the State has the constitutional duty to furnish an accused with any exculpatory evidence pertaining to either the accused's guilt or potential punishment. It further held that the State's failure to reveal exculpatory evidence violates the accused's right to due process where the evidence is found to be

---

[4]While the Defendant listed two separate issues under the heading "Issues Presented for Review," his argument combined the two and focused exclusively on the Brady issue. In contrast, the State's response brief combined both issues into one, but argued in the context of whether or not the trial court "abused its discretion in denying the Defendant's motion for a new trial."

"material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id.

The United States Supreme Court has also ruled that the prosecution must disclose evidence which could be used by an accused to impeach a witness. See Giglio v. United States, 405 U.S. at 150; see also Johnson v. State, 38 S.W.3d 52, 56-57 (Tenn. 2001) (evidence favorable to the accused, for the purposes of a Brady violation, includes evidence deemed exculpatory in nature and evidence that could be used to impeach the State's witnesses).

Tennessee has adopted a four-prong test to evaluate an alleged Brady violation. In order to establish a due process violation under Brady v. Maryland, the Defendant must establish all four of the following criteria: (1) the Defendant made a proper request for the production of the evidence, unless the evidence was obviously exculpatory in nature and helpful to the accused, in which case the State is required to produce the information whether requested or not; (2) the information must have been favorable to the Defendant; (3) the State must have suppressed the information; and, (4) the information must have been material. State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995); see also State v. Brewer, 932 S.W.2d 1, 26 (Tenn. Crim. App. 1996).

When the accused alleges a violation of a constitutional right, such as a due process Brady violation, the accused bears the burden of establishing the constitutional deprivation by a preponderance of the evidence. See State v. Spurlock, 874 S.W.2d 602, 610 (Tenn. Crim. App. 1993); see also Edgin, 902 S.W.2d at 389. It has been said that the "key" to proving a constitutional violation under Brady is to show that the omission of the exculpatory evidence "is of such significance as to deny the defendant the right to a fair trial." Edgin, 902 S.W.2d at 389.

The Defendant claims the State failed to reveal the agreement between Detective Shults, the child support referee, and confidential informant Mr. Carr to keep Mr. Carr out of jail in exchange for his working with the Drug Task Force. The Defense claims the jury never enjoyed the opportunity to hear about the State's "agreement with a judge to keep this guy out of jail because he wouldn't pay his child support," nor did they hear the defense's theory that "that's awful strong motivation to create cases against Terrell Thomas." The Defendant asserts this evidence could and should have been used to impeach the State's witness, Mr. Carr, and was most certainly "material" to his case.

The State admits that the evidence concerning Mr. Carr's agreement with the Drug Task Force pertaining to his child support problems had "impeachment value" but maintains that the State did disclose the fact that Mr. Carr failed to make child support payments prior to trial, and the fact that the Drug Task Force made payments directly to the child support court was established at trial. The State further argues that the agreement between Detective Shults and the child support referee to keep Mr. Carr out of jail while he cooperated with the police was immaterial, and therefore not a Brady violation.

The trial court found no Brady violation of the Defendant's due process rights on two separate occasions. At the conclusion of the second hearing on the motion for new trial the judge ruled:

> [I]n this particular case even though it may appear that full and complete disclosure of certain facts may not have been made, there's nothing to lead the Court to set aside these convictions because the proof was just abundant. . . . The Court is aware of the fact of course that, you know, [defense counsel] could have made an argument at the time about, you know [Mr. Carr] was released from custody by a referee and put all of this in front of a jury just exactly like it happened.
>
> But that evidence really just doesn't have that much bearing. His credibility, even if it had been totally destroyed, wouldn't have changed the outcome of this trial in the Court's opinion.

The Defendant subsequently filed a motion to reconsider, alleging the trial court used the wrong standard in denying Brady relief. At the conclusion of the hearing on the motion to reconsider, the trial judge again found no Brady violation, but in his ruling from the bench specifically addressed the four Brady prerequisites, citing to State v. Edgin. The trial judge held that: (1) the Defendant had adequately requested the information; (2) the court was unsure whether or not the State "suppressed" the information, as it "very easily could have been an oversight"; and (3) the information was favorable to the Defendant. However, the court based its ruling on the fourth element of materiality, declaring that both Edgin and the Supreme Court case of United States v. Agurs, 427 U.S. 97 (1976), held that when there was only a general request for Brady information the undisclosed information was "material" if it "creates a reasonable doubt that did not otherwise exist." The trial judge concluded that the undisclosed impeachment evidence concerning the State's arrangement to suspend Mr. Carr's capias was not material, thus finding no Brady violation.

We affirm the trial court's ruling that the Defendant failed to prove a due process violation under Brady, but we note that the trial court applied the incorrect standard for determining materiality. First, we find that the Defendant did properly request the impeachment evidence through general "boiler plate" Motions for Discovery and Motion to Produce Exculpatory Material.[5] Second, we agree with the trial court that the impeachment evidence in question is favorable to the Defendant, noting that even the State conceded this point. See Giglio, 405 U.S. at 154 ("when the

---

[5]These motions were truly "boiler plate" motions in that they were two of seven "standard" motions in the "Master Motion" the Public Defender's Office routinely filed in every case it handled. In an effort to aid the Tennessee State Government's goal of paper reduction, the Circuit Court for the Fourth Judicial District issued an order dated December 18, 1993, granting the Public Defender's Office permission to file one "master" set of motions with the court clerk "in lieu of filing separate motions with each case." The Public Defender's Office filed a motion in December of 2002 to request the "standard motions" be filed on behalf of forty-two indigent defendants it was representing at the time, including the Defendant in this case. Nonetheless, these "standard" motions did clearly request exculpatory information pertaining to the Defendant's case, citing to both Brady and Giglio. Moreover, these motions specifically requested evidence that could be used to impeach a State's witness, and information pertaining to witnesses that had been awarded "immunity, leniency" or "any other award or promise by the State of Tennessee."

-6-

reliability of a given witness may be determinative of guilt or innocence, non-disclosure of evidence effecting credibility falls within [the Brady] rule").  Third, we find that the Defendant has proved by a preponderance of the evidence that the State suppressed the impeachment evidence.  While the trial judge's speculation that the State's failure to disclose the impeachment evidence may have been nothing more than an "oversight," we note that the State bears the burden of disclosing all material evidence irrespective of the "good faith" intentions of the prosecution.  See Brady, 737 U.S. at 87.  However, it is the fourth requirement, that the undisclosed evidence must be "material," which the Defendant has failed to establish by a preponderance of the evidence.

In Brady, the United States Supreme Court ruled that "suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment. . . ." Brady, 737 U.S. at 87 (emphasis added).  However, the Brady Court did not define "materiality."  In Edgin, the Tennessee Supreme Court, relying on the United States Supreme Court case of United States v. Agurs, 427 U.S. 97, 103-07 (1976), noted that there were three different situations involving Brady information and each had its own different standard of materiality.  Edgin, 902 S.W2d at 389.  The three situations were: (1) undisclosed use of perjured testimony by the prosecution; (2) undisclosed information following a specific request by the defense; and (3) undisclosed information following a general request or no request by the defense.  See id.  The court declared that, pursuant to Agurs, when only a general request was made for Brady information, the "undisclosed information is 'material' if it 'creates a reasonable doubt that did not otherwise exist.'" Id. (citing Augurs, 427 U.S. at 112).  The Edgin court observed in a footnote that this standard for materiality for general Brady requests was "easier for the defendant to meet" than the standard for the other situations involving Brady information.  Id. at 389 n.9.

However, in Edgin the Tennessee Supreme Court granted a motion for rehearing based on new case law just released by the United State Supreme Court, Kyles v. Whitley, 514 U.S. 419 (1995), and subsequently issued an "Opinion on Petition for Rehearing," in which it amended the standard of materiality for general Brady information requests.  The court then declared: "[W]e find that the standard of 'materiality' used in Edgin is incorrect under Kyles." Edgin, 902 S.W.2d at 390 (opinion on rehearing).  The court then held:

> [R]egardless of whether the defendant makes a general request, a specific request, or no request whatsoever for Brady material, the standard for "materiality" is the same: i.e., there is constitutional error "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."

Id. (citing Kyles, 514 U.S. at 434).   We believe this standard for materiality to be the current rule of law governing Brady violation claims in Tennessee.[6]

---

[6]We do note that in the unpublished opinions of Billy Joe Bourff v. State, No. 03C01-9705-CR-00189, 1998 WL 381970, at *3 (Tenn. Crim. App., Knoxville, July 9, 1998) and Alvin Seagroves v. State, No. 01C01-9711-CC-

(continued...)

While the impeachment evidence the Defendant claims to be a <u>Brady</u> violation may have served to further weaken the credibility of one of the State's witnesses, it is cumulative impeachment evidence and relatively insignificant in comparison to the evidence that was presented to the jury at trial. The jury did hear that Mr. Carr was a former drug user, that he had recently been convicted for shoplifting--a crime of dishonesty, that he had child support problems, and that the Drug Task Force did have a working relationship with him whereby he was paid for his services. The fact that the Task Force also temporarily suspended a capias for Mr. Carr while he helped them pursue drug dealers cannot be construed to be so significantly damaging to Mr. Carr's credibility so as to alter the result of the Defendant's conviction. Additionally, the drug sale was audio taped, played for the jury, and Detective Shults as well as Mr. Carr both identified the Defendant's voice on the tape. Thus, we conclude there is no reasonable probability that had the impeachment evidence been disclosed to the Defendant earlier the result of the Defendant's proceeding would have been different. This issue has no merit.

### B.  New Trial Based on New Evidence

The Defendant claims that the agreement between Detective Shults, the child support referee and Mr. Carr to keep Mr. Carr out of jail in exchange for his cooperation with the Drug Task Force--of which the Defendant did not learn until after his trial--amounted to newly discovered evidence which demanded a new trial. Therefore, the Defendant asserts that the trial court's denial of his motion for new trial was in error. We disagree.

We begin by noting that the decision to "grant or deny a new trial on the basis of 'newly discovered' evidence rests within the sound discretion of the trial court." <u>State v. Arnold</u>, 719 S.W.2d 543, 550 (Tenn. Crim. App. 1986). With respect to the Defendant's claim that the court below erred in denying a motion for new trial based on newly discovered evidence, our standard of review is abuse of discretion. <u>State v. Meade</u>, 942 S.W.2d 561, 565 (Tenn. Crim. App. 1996).

In seeking a new trial based on newly discovered evidence, a defendant must establish three elements: (1) that he or she used "reasonable diligence" in attempting to discover the evidence; (2) the evidence is material; and (3) the evidence would have likely changed the result of the trial. <u>See</u> <u>State v. Caldwell</u>, 977 S.W.2d 110, 116 (Tenn. Crim. App. 1997) (<u>citing</u> <u>State v. Goswick</u>, 656 S.W.2d 355, 358-60 (Tenn. 1983)). In order to meet "reasonable diligence" a defendant must demonstrate that neither the defendant nor defense counsel had knowledge of the alleged newly discovered evidence prior to trial. <u>Caldwell</u>, 977 S.W.2d at 117 (<u>citing</u> <u>Jones v. State</u>, 452 S.W.2d 365, 367 (Tenn. Crim. App. 1970)).

In addition, when it appears that the newly discovered evidence "can have no other effect other than to 'discredit the testimony of a witness at the original trial, contradict a witness' statements or impeach a witness,'" the trial court generally should not order a new trial. <u>Caldwell</u>,

---

[6](...continued)
00553, 1999 WL 233543, at *1 (Tenn. Crim. App., Nashville, April 22, 1999) this Court quoted the old <u>Agurs</u> "reasonable doubt that did not otherwise exist" standard of materiality for a general <u>Brady</u> request.

977 S.W.2d at 117 (quoting State v. Rogers, 703 S.W.2d 166, 169 (Tenn. Crim. App. 1985)).  Only if the "impeaching evidence is so crucial to the defendant's guilt or innocence that its admission will probably result in an acquittal" should a new trial be ordered.  State v. Singleton, 853 S.W.2d 490, 496 (Tenn. 1993) (citing Rogers, 703 S.W.2d at 169).   However, when a verdict is already one of "questionable validity," newly discovered evidence of relatively minor importance may be sufficient to create a probability of acquittal.  See id.

In the case before us the trial court determined that, even considering the fact that some impeachment evidence was not known at the time of the trial, the "proof was just abundant."  The court further declared that the evidence of the arrangement between Mr. Carr, Detective Shults and the child support referee "really just [didn't] have much bearing" in the Defendant's case.  The trial court concluded that even if the evidence had been discovered by the Defendant before trial and used to attack the credibility of Mr. Carr, it "wouldn't have changed the outcome of this trial in the Court's opinion."  Because we find no abuse of discretion on the part of the trial court, this issue is without merit.

## CONCLUSION

For the forgoing reasons, we conclude that the Defendant has failed to demonstrate that he has suffered a Brady violation.  We further conclude that the trial court did not abuse its discretion in denying the defendant's motion for a new trial based on newly discovered evidence.  Therefore, we affirm the judgment of the trial court.

_____
DAVID H. WELLES, JUDGE