# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### May 19, 2010 Session

## STATE OF TENNESSEE v. TONY LEE CROWE

### Appeal from the Criminal Court for Putnam County
### No. 06-0304     Leon Burns, Judge

### No. M2009-02194-CCA-R3-CD - Filed July 16, 2010

The Defendant, Tony Lee Crowe, was convicted by a Putnam County Jury of two counts of rape of a child and two counts of aggravated sexual battery. As a result, he was sentenced to sixteen years incarceration, to be served at 100%. On appeal, he alleges that the trial court improperly denied his motion for new trial based on newly discovered impeachment evidence and recanted testimony. After a review of the record, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

DAVID H. WELLES, J., delivered the opinion of the Court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

H. Marshall Judd, Assistant Public Defender, Cookeville, Tennessee, for the appellant, Tony Lee Crowe.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; William E. Gibson, District Attorney General; and Beth Willis, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## Factual Background

The Defendant was convicted by a jury of two counts of rape of a child and two counts of aggravated sexual battery.[1] He received an effective sentence of sixteen years, to be served at 100%.

The facts upon which the Defendant was convicted are set out in the opinion of this Court on the original direct appeal of the convictions:

At trial, the State presented several witnesses including Dorothy Sevier, Sue Ross, M.M.,[2] and M.S., the victim. Dorothy Sevier, the victim's mother, testified that the victim was under 13 years of age during the time listed in the indictment. She explained that their home was close to Crowe's, that her family "spent a whole lot of time" with Crowe's family, and that she considered them to be friends. Sevier allowed the victim to visit Crowe's family without her supervision when the victim was older. She stated the victim would visit Crowe's home "almost everyday" to "[play] on the computer, and [do] some homework." Sevier also testified that the victim told her she went to Crowe's house because "[she had] to have something to do."

Sevier stated that before Crowe and his family moved away, "the victim wanted [her] to tell [Crowe] that she had went [sic] to [Sevier's] niece's house" when in reality the victim "stayed hid [sic] in [Sevier's] house, and [ ] didn't want to take no [sic] phone calls or anything." When Crowe eventually moved away, Sevier was concerned because he would repeatedly call the victim. Sevier testified that Crowe sent the victim a birthday card with a handwritten note which stated, "I love you and miss you." Sevier read the card, which was addressed to the victim, and later provided it to the police. After reading the card, Sevier was "upset" because "it didn't really sound right." Consequently, Sevier telephoned the parents of M.M., the victim's friend, who she later understood was "involved too."

---

[1] The trial court merged the two counts of aggravated sexual battery.

[2] This witness is a minor who is noted in the record as a victim in a related case. Thus, we will refer to this witness by initials only.

Sevier also testified that Crowe sent the victim a Christmas card. After receiving the Christmas card, Sevier contacted the police. Crowe continued to call the victim's home so much they were forced to get a new phone number. On cross-examination, Sevier admitted that after the Crowe family moved away, she and the victim traveled to Sevierville to visit them. Crowe and his family rented cabins in the Smokey Mountains for the victim and her family. Sevier and the victim stayed in a cabin with Crowe's mother while the victim's father stayed in a cabin with Crowe. Sevier also admitted that the families loaned each other money. She stated that Crowe "would always buy [the victim] stuff." He would specifically buy her wolf figurines and burn songs onto CD's for her to play at home. Sevier explained "it kind of bothered [them] . . . but [Crowe] kind of insisted on doing it." She knew that Crowe had some health problems and that he was on a breathing machine at home. She further testified that during the time period listed in the indictment she was not working and was at home "almost every day."

Between 2002 and 2005, Sevier stated that the victim's pediatrician was Dr. Christopher Climaco. In 2005, she switched doctors and took the victim to Cookeville Medical Center. Although the victim at one point expressed an interest in moving to an apartment in Sevierville, Sevier testified that the victim later begged her not to move.

Sue Ross, an employee at Our Kids Center in Nashville, testified that Our Kids Center is an out-patient facility of Metro Nashville General Hospital. Ross began working in the nursing field in 1968. She received her nursing diploma from St. Thomas School of Nursing in Nashville; her bachelor's degree in nursing from the University of Tennessee Center for Health Sciences in Memphis, where she also went through the pediatric nurse practitioner program; and her master's degree in nursing from Vanderbilt University in Child and Adolescent Health.

Ross stated that she had previously testified numerous times in criminal and civil cases. She had personally examined "around 3800" children that had been the victims of sexual assault. Ross explained the normal protocol under which a child is examined by Our Kids Center and confirmed that the victim was seen at the Our Kids Center on March 21, 2006. Ross testified that she medically examined the victim and prepared a report. Ross's examination of the victim revealed the following:

From the non-genital standpoint, a normal exam. A child that had, clearly was going through, or at least in puberty, based on tanner (spelled phonetically) staging of her breasts. For the genital area, what I found was, again, a child who was pubertal. I found an estrogenized hymen.

Ross was unable to confirm or deny any type of sexual abuse to the victim. However, Ross explained that her findings were not inconsistent with the victim's complaint because the hymen does not always tear when digital, genital, or penile genital penetration occurs. On cross-examination, defense counsel asked, "But if you were talking about rape, you might find signs of injury, a doctor or a nurse might find signs of injury, or bruising, or something like that, wouldn't they?" Ross replied:

You might. The greater odds are, you will not. The vast majority of children that we see non-acutely, like we saw with [the victim], and even acutely, when we see them in the emergency room hours to a couple of days after their assaults, ordinarily have virtually no physical findings. That's the rule. It's the exception that there are tears in the hymen.

The victim, M.S., testified and confirmed that she was less than thirteen years old during the period listed in the indictment. She identified Crowe at trial. She said that she met Crowe when she was three years old and that he was a "family friend." She stated that she would go to Crowe's house to play video games on the computer in Crowe's room. Her house was within walking distance of Crowe's, and sometimes her parents would allow her to go to Crowe's house without them.

When the victim was nine years old, she was in Crowe's room playing a video game. Crowe's mother was in the kitchen doing dishes. The victim testified that Crowe's mother briefly came into Crowe's bedroom, but she left. At some point, Crowe closed the door to the room and "something bad happened." Crowe told the victim to take her pants off and go by his bed. The victim took her pants and panties off. Crowe did not have on any pants or underwear. Crowe told the victim to "bend [her] legs up," and he held her legs at her shoulders and touched her "private part and [her] breasts." The victim was asked what she meant when she said "private part," and she explained, "My vagina? I don't know." The victim testified that Crowe put his penis all the way inside her vagina and that it hurt.

-4-

During the above incident, the victim stated that Crowe had a weapon in the room. She was shown a photograph of a weapon and confirmed that it was the same weapon that she saw in Crowe's room. The picture was entered into evidence as Exhibit 3. The victim stated Crowe held the weapon to her throat and told her if she told anyone about what he had done to her, he would kill her family in front of her and then kill her. The victim testified that she believed him.

Sometime between September 2004 and October 2004, another incident occurred. The victim recalled she was working on a school science project and asked Crowe if she could use his computer. She stated that M.M., "a really close friend" from her neighborhood, went with her to Crowe's house. Crowe and his mother were at his home. The victim testified that she finished her school project, but at some point, she found herself in Crowe's room with M.M. Crowe closed the door and told her to take her pants and panties off. The victim further testified that Crowe touched her breasts and her vagina with his fingers. However, Crowe did not threaten her. The victim stated Crowe "practically done [sic] the same thing he done [sic] the first time."

Another incident occurred around the end of June 2005, prior to Crowe's moving away. The victim stated that she was in Crowe's room, and that "[Crowe] forced her again to do the same thing that he'd done for the other two times." Crowe touched the victim's breasts and penetrated her vagina with his penis. It was only after the third incident that the victim told someone what was happening. The victim was afraid to tell anyone because she believed that Crowe would kill her parents and her family. The victim also confirmed that Crowe (1) sent her two cards, (2) would buy her gifts, (3) told her he loved her, (4) talked about marrying her, and (5) telephoned her incessantly.

On cross-examination, the victim admitted that before the incidents she had visited Crowe's home almost every day to do her homework. The victim described Crowe's home as a small, two bedroom apartment with a living room, bathroom, and kitchen. When asked why she took her pants off, the victim replied, "Because he had threatened me with the gun first." The victim explained that she continued to go back to Crowe's house after the first incident "[b]ecause he told [her] to." She stated that she did not yell or scream while Crowe penetrated her even though it hurt. She further confirmed that Crowe's mother was in the apartment when each incident occurred. She stated that she would make telephone calls to Crowe "[s]ometimes." She agreed that

Crowe would give her money and that her family would go to his apartment for dinner and to watch television.

M.M., the victim's friend, testified that she went to Crowe's house, along with the victim, to work on a school project. At some point, she and the victim were in Crowe's room with the door closed. Crowe's mother was either in the kitchen or her room. M.M. testified that Crowe told the victim to take her clothes off and then touched the victim with his finger. When pressed by the prosecutor about specifics, M.M. only replied affirmatively to Crowe touching the victim "where she goes to the bathroom" and on her "boobies." On cross-examination, M.M. explained that it was both the victim's and her idea to go to Crowe's house the day this incident occurred. She saw a gun the day of the incident but did not tell anyone about it "[b]ecause [she] got scared."

Yvette Deming, a sergeant with the Cookeville City Police Department's Criminal Investigation Division, testified that she spoke with Crowe regarding the allegations in this case. Sergeant Deming stated that Crowe was cooperative and confirmed that the victim visited his home "just about every day" and had been in his bedroom "a number of times." He admitted to previously calling the victim's home "15 or 18 times" a day because her family was not answering his calls. He called the police department to perform a "welfare check" on the family to ensure they were safe. Sergeant Deming asked Crowe if he had any weapons in the home, and Crowe told her that he kept a number of weapons locked in a gun cabinet. Sergeant Deming also asked Crowe's mother if there were any other weapons in the home, and Crowe's mother showed her a rifle wrapped in camouflage tape that she had placed under a blanket on her bed. Sergeant Deming was shown Exhibit 3 and confirmed that it was the same rifle she recovered from Crowe's home. Crowe also admitted to Sergeant Deming that in October of 2005, he sent the victim a birthday card and wrote, "I love and miss you very much, [M.S.]" on the envelope. The handwritten letter inside the card stated the following:

> [M.S.], I'm still waiting on your answer[,] and you know that I love you more than anything in this whole world, and it's killing me being away from you and not being able to spend any time with you, because you're the light of my life and the only happiness I've ever know [sic]. And since you're not here with me, it feels like my whole world has been taken away from me.

-6-

I don't know why you don't bother to take the time to call me even for a few minutes when you know how much I love and miss you. I hurt every day that I can't be with you, or hear your voice to know that you're all right and no one is hurting you or worse. I worry about you all the time, and I think about you all the time. I've never let anyone as close to my heart as I have you, and I've never let myself love anyone as much as I love you. I'm sorry that I'm not there on your twelfth birthday, but you never bothered to care enough to even ask me to come, so I sent you my love in this card.

The letter was signed, "Love always and forever, [Crowe]. Call me. [Crowe's phone number] My number. Don't lose it. Write it down ."

In the Christmas card sent to the victim that was postmarked December 24, 2005, Crowe wrote:

[The victim's name], I love and miss you very much, and I don't know why you're treating me the way you are and doing the things that you're doing when you know how much I love and care about you. I do not like your silence that you are giving me, but I will respect your decision to shut me out of your life if that's what you really want, because that's how much I love and care about you. I've shown you nothing but love and kindness. If you no longer want my love and friendship, I have no choice but to do what I have to do, because everyone's fate is sealed by the choices that they make. I want to wish you a very Merry Christmas and a Happy New Year, and if I don't hear from you soon, I will know what your answer is. Your silence to me means you want nothing to do with me anymore, or you calling me means that you do, but either way, I'll know for sure. Love, [Crowe] P.S. Remember, I have always loved you and always will.

Crowe told Sergeant Deming that the two aforementioned letters were written in the same context as a father writing a letter or sending a card to his daughter.

The defense proof consisted of Dr. Christopher Climaco, Shirley Harris, Debra Davidson, and the defendant-appellant. Dr. Christopher Climaco, the

victim's pediatrician, testified that he went to medical school in the Philippines and was a board-certified medical doctor. He completed a three-year pediatric residency in New York City. He further testified that he had been a doctor for the past eleven years. The defense offered Dr. Climaco as an expert without identifying a specific area of expertise. He was admitted as an expert without objection from the State. Dr. Climaco testified that the victim was one of his patients from August 2000 to November 28, 2005. On July 11, 2002, Dr. Climaco "checked the victim for sexual abuse." His examination revealed "no evidence of sexual physical abuse, and the vagina was normal, without any signs of trauma." Dr. Climaco stated the victim told him "nothing happened," and he had written "'nothing happened' according to patient" in quotation marks in his notes. Additionally, according to Dr. Climaco's records, he did not perform another examination for sexual abuse in 2002. Dr. Climaco further testified that he saw the victim on October 8, 2004, October 26, 2004, November 9, 2004, February 7, 2005, September 22, 2005, and November 28, 2005. Dr. Climaco treated the victim on these dates for a variety of things, none of which were related to sexual abuse. However, on May 26, 2005, the victim had a physical exam of her genitalia which was normal. Dr. Climaco explained that a finding of "normal female genitalia" meant that he did not "see any discharges, . . . signs of trauma, or any signs of inflammation." His records did not indicate whether the victim's hymen was intact during this examination. Dr. Climaco testified that he had examined thousands of children and "[w]ith full penetration, the hymen should not be intact."

On cross-examination, Dr. Climaco agreed it would be difficult for a child to tell him about sexual abuse. Although he received training regarding sexual abuse during his residency, Dr. Climaco had not attended any "updated classes, or continuing education each year about sexual abuse[.]" Dr. Climaco explained that whether the hymen is torn by digital penetration of a child's vagina depends on how far the finger is inserted. When questioned about his testimony during direct examination that the hymen could not be intact with full penetration, he stated he did not know if a child's age, particular genetic make-up, or the elasticity of the hymen would make a difference.

Shirley J. Harris, Crowe's mother, testified that both she and her son were disabled and received Social Security. She stated that Crowe was thirty-eight years old, had lived with her since he was born, and had "a lot of medical problems." She first met the victim and her family when the victim was three years old. Harris emphasized that her apartment was "really small." When the victim would come to her home, Harris explained that she and

Crowe would help her with her homework. According to Harris, the victim never went into Crowe's room without her because the victim followed Harris around "like a little chick." If the victim did go into Crowe's room, Harris testified that the door would remain open. Harris stated that Crowe had a shotgun that he kept locked in a gun cabinet, and she had a rifle. Both weapons were obtained "strictly for [] home protection." Harris stated the victim knew about both weapons.

Harris recalled the day that M.M. and the victim came to visit her home to work on a school project. Harris testified Crowe went into his bedroom and retrieved some information from the computer. He came into the living room and gave it to the victim and M.M. Harris watched the victim and M.M. work on the project until they were finished. She stated neither the victim nor M.M. ever went into Crowe's room alone. On cross-examination, Harris maintained that the victim was never in Crowe's room without her.

Debra Davidson, Crowe's sister, also testified that Harris and Crowe moved to Sevierville to be near her in May of 2005. Prior to moving to Sevierville, Davidson lived in Cookeville and frequently visited Harris' apartment because they were very close. She also confirmed that the victim often visited Harris' apartment. She stated the only time the victim would be in Crowe's room was when a group of them were playing a video game together. In response to being asked whether she had seen anything inappropriate happen to the victim, Davidson stated the victim had just come from home and told her, "My butt hurts." Davidson testified that the victim would cry and "throw a fit" whenever her father wanted her to come home. Finally, Davidson stated that whenever she was at Harris' apartment, she never observed her brother do anything inappropriate to the victim.

Crowe testified that he completed the ninth grade and then obtained his GED. He stated he was an oxygen patient and had several medical conditions; including, sleep apnea, epilepsy, diabetes, and back trouble. On May 1, 2005, Crowe moved to Sevierville to be with his sister. Before he moved, he lived close to the victim in a small apartment with his mother. He denied the allegations as testified to by the victim. Crowe provided a lengthy explanation as to why he wrote the two aforementioned letters to the victim but confirmed that he did so because "[he] love[d] her . . . like a child, just like any adult or any parent would love a child that they had practically raised from a little small child up."

Crowe took the victim and her family to church with him and attended Sunday School class during the time period he was alleged to have committed these offenses. He admitted to having weapons but stated they were only for protection. He denied threatening the victim and testified that he had never been convicted of a misdemeanor or a felony. He stated that M.M. came to his home once with the victim and that he helped both of them with a school project. According to Crowe, neither M.M. nor the victim ever entered his bedroom that evening.

State v. Tony Lee Crowe, No. M2008-00092-CCA-R3-CD, 2009 WL 507683, at *1-7 (Tenn. Crim. App., Nashville, Mar. 2, 2009) (footnote in original).

On direct appeal, a panel of this Court affirmed the Defendant's convictions but remanded the case to the trial court for consideration of the Defendant's third amended motion for new trial, wherein he argued that newly discovered evidence required a new trial.[3] See id. at *7-11.

A hearing on the merits of the third amended motion for new trial was held on May 21, 2009. M.M., who had testified at the Defendant's trial that she was present in the Defendant's bedroom when the Defendant sexually assaulted the victim and that she saw a gun on the day of the incident, was first to testify at the hearing. M.M. testified that she continued to talk with the victim after the Defendant's trial. During one visit by the victim to M.M.'s home, the victim told M.M. that the Defendant did not have a gun and relayed that she fabricated the rape story. According to M.M., the victim lied because she got mad at the Defendant for touching her in the "wrong places." M.M. testified that she informed her step-father of their conversation.

M.M. confirmed that, after trial, she met with the Defendant's lawyer and signed an affidavit. She stated that the contents of that affidavit were true. In the affidavit, M.M. recanted her testimony that she saw a gun during the sexual assault of the victim. M.M. also relayed that the victim told her she made up the story about the gun and about having sexual relations with the Defendant because the victim was mad at the Defendant for touching her in the "wrong places."

---

[3] On December 3, 2008, the Defendant filed a petition for coram nobis relief alleging the same issue. In its order denying the Defendant's third amended motion for new trial, the trial court also denied the coram nobis petition. The Defendant filed a motion in this Court to remand this case to the trial court for a hearing on his petition for a writ or error coram nobis. The motion was denied, noting that the Defendant has been afforded the opportunity to litigate the question of newly discovered evidence. See Tenn. Code Ann. § 40-26-105(b) (relief limited to matters that were not litigated on a motion for new trial).

On cross-examination, M.M. confirmed that both she and the victim were sexually assaulted while together in the Defendant's bedroom. When asked if she saw a gun that day, she stated, "I don't remember."

M.M.'s stepfather then testified at the hearing. He stated that, while the victim was visiting with M.M. after the trial, M.M. came out from her room and told him that the victim admitted to lying about the Defendant. Specifically, the victim told M.M. that she had made up the story about the Defendant having a gun and about having a sexual relationship with the Defendant because the victim was mad at the Defendant. M.M.'s stepfather stated that he immediately called the Defendant's lawyer's office and spoke with counsel. According to M.M.'s stepfather, the victim had a "tendency to exaggerate."

On cross-examination, he testified that M.M. and the victim were no longer friends. He stated that, if M.M. testified at trial that she saw a gun, he would have believed her. He confirmed that M.M. was shy and not very outgoing.

Then, M.M.'s stepfather testified, apparently for the first time and contrary to his earlier testimony, that he overheard the conversation between the victim and M.M. that M.M. had relayed to him. He stated that he heard the victim say she lied because she was mad at the Defendant because he "wouldn't buy her something . . . ." Specifically, he heard the victim say that the Defendant did not have a weapon and that sexual relations did not occur. He acknowledged that the victim and his stepson had been dating, but had an "ugly" breakup.

Following the hearing, the trial court entered an order detailing its findings and denying the Defendant's third amended motion for new trial. Subsequently, the Defendant filed a timely notice of appeal.

## Analysis

The Defendant argues on appeal that the trial court improperly denied the motion for new trial based on newly discovered evidence. Specifically, he contends that the trial court erred when it found neither witness (M.M. or her stepfather) to be credible.

The usual test for whether a defendant should be granted a new trial based on newly discovered evidence is: (1) did the defendant act with reasonable diligence to discover the evidence; (2) is the newly discovered evidence material; and (3) will introducing the evidence likely change the result if accepted by the jury. State v. Meade, 942 S.W.2d 561, 565 (Tenn. Crim. App. 1996) (citing State v. Nichols, 877 S.W.2d 722, 737 (Tenn. 1994)). The test for granting a new trial in cases involving recanted testimony as newly discovered evidence is based on the following criteria: (1) whether the trial judge is reasonably well-satisfied that the testimony given by a material witness was false and that the new

testimony is true; (2) whether the defendant was reasonably diligent in discovering the new evidence or surprised by false testimony, or was unable to know of the falsity until after the trial; and (3) whether the jury might have reached a different conclusion had the truth been told. State v. Housler, 193 S.W.3d 476, 494 (Tenn. 2006) (citing State v. Mixon, 983 S.W.2d 661, 666 (Tenn. 1999)). When the basis for the newly discovered evidence is recanted testimony, the test should include a determination by the trial judge whether the recanting witness' current testimony seems credible. State v. Phillip Lloyd Herndon, No. 03C01-9303-CR-00098, 1994 WL 176969, at *2 (Tenn. Crim. App., Knoxville, May 11, 1994); see also Housler,193 S.W.3d at 494. The decision as to whether to grant a motion for new trial on the basis of newly discovered evidence lies within the sound discretion of the trial court. State v. Caldwell, 977 S.W.2d 110, 117 (Tenn. Crim. App. 1997) (citing Hawkins v. State, 220 Tenn. 383, 417 S.W.2d 774, 778 (Tenn. 1967)).

In this case, the trial judge resolved the issue of whether the post-trial testimony of M.M. and her stepfather was credible. In the order denying relief, the judge stated:

> The testimony of both these witnesses has been carefully reviewed. The transcripts of the hearing and the trial have been compared. The witnesses were obviously observed by the [c]ourt and after considering all that has been said and the circumstances surrounding the testimony given at this hearing, the [c]ourt has come to the conclusion that it cannot be believed.
>
> . . . .
>
> In the instant case, the [c]ourt is not satisfied that the new testimony is true or that the testimony by the material witness, [the victim M.S.], was false.

The trial court had the opportunity to observe the witnesses, noting that M.M. was a "very shy witness" and referring to M.M.'s stepfather's testimony as "sketchy." At the motion for new trial hearing, M.M. did not affirmatively recant her trial testimony that she saw a gun, stating only that she did not remember if there was a gun. Further, we note that the primary purpose of the testimony would have been to impeach the victim's testimony that she was raped by the Defendant while a weapon was present. A court should not grant a new trial where it appears that the new evidence can have no other effect than to discredit the testimony of a witness, contradict a witness' statements, or impeach a witness, unless the testimony of the witness who is sought to be impeached was so important to the issue and the evidence impeaching the witness is so strong and convincing that a different result at trial would necessarily follow. Rosenthal v. State, 292 SW.2d 1, 4-5 (Tenn. 1956). The trial court found the testimony not to be credible; in fact, M.M.'s stepfather changed his story again at the motion for new trial hearing. Moreover, there was other independent proof of

a weapon inside the Defendant's home, and the State's theory was not based upon the use of a weapon, but the age of the child.  Upon review, we conclude that the trial court did not abuse its discretion in denying the motion for a new trial.

## Conclusion

Based upon the foregoing reasoning and authorities, we affirm the judgment of the trial court denying the Defendant's motion for new trial.

_____
DAVID H. WELLES, JUDGE

-13-